COMMONWEALTH of Pennsylvania,
Appellant

v.

Jeffery Charles MAGUIRE

No. 654 MDA 2016

Superior Court of Pennsylvania.

Argued January 24, 2017
Filed November 08, 2017
Reargument Denied January 18, 2018

Christopher J. Schmidt, PA Office of Attorney General, Harrisburg, for Commonwealth, appellant.

Robert T. Rosamilia, Lock Haven, for appellee.

BEFORE: LAZARUS, J., STABILE, J. and DUBOW, J.

OPINION BY DUBOW, J.:

The Commonwealth appeals from the March 22, 2016 Order, entered in the Clinton County Court of Common Pleas, granting the Motion to Suppress Evidence filed by Appellee, Jeffrey Maguire ("Maguire") in which Maguire sought to suppress evidence inspectors obtained without a warrant from an inspection of his commercial vehicle conducted during a systematic vehicle inspection program.[1] Because we find that the *Tarbert/Blouse* [2] guidelines do not apply to the inspection of the commercial vehicle in this case and the warrantless inspection meets the requirements of *New York v. Burger*, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987), and its progeny, we reverse.

In April 2015, the Pennsylvania State Police ("PSP") and the Department of Environmental Protection ("DEP") organized a joint program, pursuant to 75 Pa.C.S. § 4704(a)(2) ("Section 4704(a)(2)"), to inspect commercial vehicles at the Clinton County Landfill in Wayne Township.[3]

On May 20, 2015, PSP Trooper Corey Beaver, a Motor Carrier Enforcement Officer, and a Motor Carrier Enforcement Supervisor, went to the landfill to conduct inspections of commercial vehicles at the landfill. *See* Trial Court's Findings of Fact, 3/22/16, at ¶¶ 1–9.

The inspection officers established a procedure whereby each officer, as he or she became available, would stop the next truck entering the landfill. *Id.* at 10.

Trooper Beaver was in a marked patrol car when Maguire arrived in a commercial vehicle, a tri-axle dump truck. Trooper Beaver exited his vehicle and motioned for Maguire to pull into the lot where the

---

1. *See* Pa.R.A.P. 311(d) (Commonwealth may appeal as of right from Order that does not end entire case where Commonwealth certifies in notice of appeal that Order will terminate or substantially handicap prosecution). Here, the Commonwealth included in its Notice of Appeal a certification that the March 22, 2016 Order, granting Maguire's Motion to Suppress, "will terminate or substantially handicap the prosecution in the above-captioned matter." Commonwealth's Notice of Appeal, 4/20/16.

2. *Commonwealth v. Tarbert*, 517 Pa. 277, 535 A.2d 1035 (1987) (plurality); *Commonwealth v. Blouse*, 531 Pa. 167, 611 A.2d 1177 (1992).

3. Section 4704 authorizes regulatory inspections of commercial vehicles, drivers, documents, equipment, and loads to ensure that their condition complies with Department of Transportation regulations ("DOT"). *See* 75 Pa.C.S. § 4704(a)(2).

officers were conducting the inspections. Trooper Beaver asked Maguire for his documents. While speaking with Maguire, Trooper Beaver smelled the odor of an alcoholic beverage emanating from his breath.

Maguire provided Trooper Beaver with the necessary documents, and Trooper Beaver conducted a "Level Two" inspection, which, in addition to a review of the documents, included an inspection of lights, horn, wipers, tires, wheel condition, and safety equipment. *Id.* at ¶¶ 15–20.

After the inspection, Trooper Beaver asked Maguire to exit the vehicle, which Maguire did. Trooper Beaver asked Maguire if Maguire had been drinking and advised Maguire that Trooper Beaver detected the odor of alcohol.

Maguire responded that he "drank a beer" on his way over to the Landfill. Trooper Beaver observed a cooler on the floor of the truck, in front of the gearshift, and asked Maguire about the contents. Maguire responded that it contained water and beer. The cooler contained three 12–ounce cans of Busch Light beer and a few water bottles. *Id.* at ¶¶ 21–27.

Trooper Beaver then conducted field sobriety testing on Maguire. Maguire failed two of the three tests. Trooper Beaver then transported Maguire to the hospital for blood testing. *Id.* at ¶¶ 29–31; N.T. Suppression Hearing, 5/13/16, at 12.

Following this incident, the Commonwealth charged Maguire, a commercial truck driver, with five counts of Driving Under the Influence and five counts of Unlawful Activities.[4]

Maguire filed a pretrial Suppression Motion, arguing that the *Tarbert/Blouse* guidelines applied to a commercial vehicle inspection and since the inspection in this case failed to meet those guidelines, the inspection of Maguire's truck was unconstitutional.[5]

On March 14, 2016, the trial court conducted a hearing on Maguire's Motion to Suppress, following which it granted the motion. The trial court, relying on this Court's holding in *Commonwealth v. Garibay*, 106 A.3d 136 (Pa. Super. 2014), expanded the scope of the *Tarbert/Blouse* guidelines to include an inspection of a commercial vehicle. *See* Trial Ct. Op., 3/22/16, at 6 (unpaginated). The trial court concluded that since the inspection at issue did not meet the standards set forth in *Tarbert/Blouse*, the inspection was unconstitutional and suppressed the evidence of Maguire's alcohol consumption.

The Commonwealth timely appealed and presents the following issues for our review:

1. Do the *Tarbert/Blouse* guidelines apply to commercial vehicle inspections conducted pursuant to 75 Pa. C.S.[ ] § 4704, particularly where commercial vehicle inspections are part of a highly regulated industry exception to the warrant requirement?

2. Did the trial court err because after State Police stopped Maguire's commercial vehicle to conduct a lawful commercial vehicle inspection, the State Police had probable cause to believe Maguire was operating his

---

4. Specifically, the Commonwealth charged Maguire with one count each of violating 75 Pa.C.S. §§ 3802(f)(3), 3802(f)(4), 3802(d)(1), 3802(d)(3), and 3802(d)(1)(iii), and five counts of violating 75 Pa.C.S. § 4107(b)(2).

5. *Tarbert, supra, Blouse, supra,* and their progeny have articulated five criteria that the Commonwealth must satisfy in order for a vehicle checkpoint to meet constitutional muster with respect to the protection of privacy rights.

commercial vehicle under the influence of alcohol because an odor or alcohol emanated from Maguire? Commonwealth's Brief at 4.

 When we review the grant of a Motion to Suppress, we consider "only the evidence from the defendant's witnesses along with the Commonwealth's evidence that remains uncontroverted." *Commonwealth v. Guzman*, 44 A.3d 688, 691–92 (Pa. Super. 2012). Our standard of review is restricted to whether the record supports the suppression court's factual findings. With respect to legal conclusions, however, we conduct *de novo* review. *Id.*

Since the only evidence in this case was that of Trooper Beaver and his testimony was not contradicted, there are no relevant facts in dispute. Therefore, the issues on appeal are purely legal issues and our standard of review is *de novo. See Commonwealth v. Beaman*, 583 Pa. 636, 880 A.2d 578, 581 (2005); *Guzman, supra.*

It is well-settled that the *Tarbert/Blouse* guidelines apply to checkpoints established to inspect **non-commercial** vehicles pursuant to 75 Pa.C.S. § 6308(b).[6] *See Garibay, supra; In re J.A.K.*, 908 A.2d 322 (Pa. Super. 2006). We now consider whether the *Tarbert/Blouse* guidelines also apply to an inspection of a **commercial** vehicle that is conducted pursuant to a systematic vehicle inspection program.

The Commonwealth argues that the trial court erred in expanding the *Tarbert/Blouse* guidelines to inspections of commercial vehicles because commercial vehicle inspections fall within the closely

regulated industry exception to the Fourth Amendment warrant requirement as enumerated in *Burger*. Commonwealth's Brief at 12, 19. We agree.

The United States Supreme Court in *Burger* recognized an exception to the Fourth Amendment warrant requirement for administrative inspections in "closely regulated" businesses. The Court held that an owner or operator of a commercial business or vehicle in a closely regulated industry has a substantially reduced expectation of privacy. Thus, the Fourth Amendment warrant and probable cause requirements applicable in the context of a pervasively regulated[7] business are lower. *See Burger*, 482 U.S. at 699–702, 107 S.Ct. 2636.

The *Burger* Court also concluded that, in the context of a closely regulated business, warrantless inspections are constitutional if: (1) there is a "substantial governmental interest inform[ing] the regulatory scheme pursuant to which the inspection is made"; (2) the inspection is necessary to advance the regulatory scheme; and (3) the statute's inspection program is applied with such certainty and regularity as to provide a "constitutionally adequate substitute for a warrant." *Burger*, 482 U.S. at 702–703, 107 S.Ct. 2636. The Court ultimately held that a valid administrative inspection without a warrant that uncovers evidence of a crime does not violate the Fourth Amendment. *Id.* at 716, 107 S.Ct. 2636.

The Pennsylvania Supreme Court, in *Commonwealth v. Petroll*, 558 Pa. 565,

---

6. Section 6308(b) authorizes "systematic vehicle inspection programs," and gives authority to police officers who are "engaged in a systematic program of checking vehicles or drivers" to "stop a vehicle ... for the purpose of checking the vehicle's registration ... or [for a] driver's license ..." without the re-

quirement of articulable and reasonable grounds to suspect a violation of the Motor Vehicle Code. *See* 75 Pa.C.S. § 6308(b).

7. The *Burger* Court used the terms "closely regulated" and "pervasively regulated" interchangeably when analyzing this issue.

738 A.2d 993 (1999) addressed the constitutionality of a warrantless search of a tractor-trailer after the driver of a tractor-trailer crashed into other vehicles, killing several individuals. The police conducted the search immediately after the accident and the search was not part of a systematic vehicle inspection program.

The Pennsylvania Supreme Court adopted the three-part test that the U.S. Supreme Court enunciated in *Burger* for a closely regulated business:

1. There must be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made;

2. The warrantless inspection must be "necessary to further the regulatory scheme"; and

3. The statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant. In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers.

*Petroll*, 738 A.2d at 1000–1001, quoting *Burger*, 482 U.S. at 702–03, 107 S.Ct. 2636.

The Pennsylvania Supreme Court applied the *Burger* guidelines to facts of *Petroll*. As an initial matter, the Pennsylvania Supreme Court held that "trucking is a closely regulated industry." *Petroll*, 738 A.2d at 1001.

The Supreme Court then discussed the first element and concluded that, "there can be no dispute that the Commonwealth has a substantial interest in regulating the trucking industry for public safety." *Id.* at 1002.

Although the Supreme Court concluded that the Commonwealth failed to meet the second prong of the *Burger* test, the Court's analysis is helpful in analyzing the facts of this case. The Supreme Court found that the warrantless search of the truck in *Petroll* did not advance the regulatory scheme of removing unsafe vehicles from the highways in the Commonwealth because the police conducted the warrantless search immediately after the accident occurred and, thus, the search could not have prevented the accident. *Id.* at 1003. In other words, a warrantless search that the police conduct after an accident as part of its investigation into an accident does not further the regulatory scheme to regulate trucks and prevent accidents.

The Supreme Court also noted that the police seized a logbook, travel receipt and other documents and likewise the seizure of those items does not prevent accidents on the highways of the Commonwealth. *Id.*

With respect to the third prong of the *Burger* analysis—that the inspection program provide a constitutionally adequate substitute for the warrant requirement—the *Petroll* Court clarified that "*Burger* requires that the statute clearly inform the owner that his business is subject to periodic inspections for a specific purpose." *Id.* at 1004. Specifically, the *Petroll* Court noted that the regulatory statute must "reasonably restrict the scope and frequency of the inspection program to achieve the statutory objective" and "limit the discretion of inspections to address the specific purpose of the statutory scheme." *Id.*

■ In the instant matter, we first hold that the trucking industry is a closely regulated industry and businesses and individuals engaged in the trucking industry have a lower expectation of privacy than individual driving non-commercial vehicles. *See*

*Burger,* 482 U.S. at 702, 107 S.Ct. 2636; *Petroll,* 738 A.2d at 1000. Thus, since these businesses and individuals have a lower expectation of privacy, the *Tarbert/Blouse* guidelines do not apply to inspections of commercial vehicles in the trucking industry.[8]

■ Our analysis now turns to whether the warrantless inspection of Maguire's commercial vehicle that was part of a systematic vehicle inspection program comported with the principles the Pennsylvania Supreme Court articulated in *Petroll, supra.*

Section 4704(a)(2) authorizes an officer of the PSP or other qualified Commonwealth employee, "engaged in a systematic vehicle inspection program, to conduct an administrative inspection of a vehicle, person, documents, equipment, and load to determine whether they meet the standards established by department regulations." 75 Pa.C.S. § 4704(a)(2).

Applying the rationale set forth in *Petroll,* we conclude that the statute pursuant to which inspectors stopped Maguire's vehicle, Section 4704(a)(2), easily satisfies the first prong of the *Burger* test. The Supreme Court in *Petroll* analyzed Section 4704(a)(2) and concluded that it is part of a statutory scheme that regulates the trucking industry and "advances a substantial government interest" of ensuring road safety. This statutory scheme also furthers the regulatory scheme by ensuring that individuals and businesses in the trucking industry meet the standards set by the Department of Transportation.

We also conclude that the systematic vehicle inspection program set forth in Section 4704(a)(2) meets the second prong of the *Burger* test by advancing the regulatory scheme. In particular, the systematic vehicle inspection program advances the

government interest by removing unsafe vehicles from the roadways before accidents occur. *Petroll,* 738 A.2d at 1003.

We conclude further that Section 4704(a)(2) satisfies the third prong, as the statute is sufficiently specific to provide a constitutionally adequate substitute to the warrant requirement, *i.e.,* it advises the operator of a commercial vehicle that the regulatory search is being made pursuant to the law, it has a properly defined scope, and it limits the discretion of inspecting officers.

In particular, the statute limits the discretion of the inspecting officers by specifying the objects subject to the systematic inspection program—any vehicle, driver, documents, equipment, and load. It also identifies the purpose of the inspection—to ensure that vehicles meet established regulatory standards.

Thus, we conclude that this statute, on its face, is "sufficiently comprehensive and defined" so that a commercial truck driver is informed that his truck may be subject to periodic administrative inspections undertaken to ensure that the truck complies with DOT regulations and is road-safe. *Burger,* 482 U.S. at 703, 107 S.Ct. 2636; *see Petroll,* 738 A.2d at 1004.

Trooper Beaver's uncontradicted testimony at the suppression hearing supports this conclusion as it provided an understanding of the limits on the system of inspection and the lack of discretion the inspectors had in selecting which trucks to inspect. Trooper Beaver testified that the PSP and the DEP scheduled the instant inspection at least a month prior to the inspection at the Clinton County Landfill. He further testified that, as permitted in the statute, it was only the PSP and DEP administrative inspectors who conducted

---

8. *Petroll,* 738 A.2d at 1001.

the inspections. He also testified to the limited scope of his inspection. Specifically, he testified that he conducted a "level two inspection," which entailed a walk-around inspection of the truck's "[l]ights, horn, wipers, the tires, the condition of the tires, the tires' inflation, whether there [are] any flat tires, the wheel condition, the safety inspection[,]" as well as Maguire's documents. N.T., 3/14/16, at 10.

Trooper Beaver also described the process by which the Team selected the trucks to inspect. Simply, if an inspector was available when the truck arrived at the landfill, one of the inspectors inspected it. If the inspectors were unavailable because they were inspecting other trucks, the truck was not inspected. We find that this system for selecting trucks to inspect sufficiently limits the discretion of the inspectors and meets the third element of *Burger*.

For the foregoing reasons, we conclude that the administrative inspection at issue here satisfied the *Burger* test. Consequently, the trial court erred in suppressing the evidence obtained as a result of the warrantless administrative inspection. *Burger*, 482 U.S. at 716, 107 S.Ct. 2636 (holding that a valid administrative search without a warrant that uncovers evidence of a crime does not violate the Fourth Amendment.).

In its second issue on appeal, the Commonwealth asserts that, following the lawful warrantless inspection, the odor of alcohol on Maguire gave Trooper Beaver probable cause to believe Maguire was operating his commercial vehicle under the influence of alcohol. Commonwealth's Brief at 23. Therefore, the Commonwealth argues, the search and seizure of evidence from Maguire's truck, the responses to brief questions posed to Maguire, and the results of Maguire's field sobriety test are admissible. *Id.* at 24. We agree.

■ "Probable cause exists where [a police] officer has knowledge of sufficient facts and circumstances to warrant a prudent person to believe that [a] driver has been driving under the influence of alcohol or a controlled substance." *Commonwealth v. Hilliar*, 943 A.2d 984, 994 (Pa. Super. 2008) (citation omitted). "[A] police officer may utilize both his experience and personal observations to render an opinion as to whether a person is intoxicated." *Commonwealth v. Williams*, 941 A.2d 14, 27 (Pa. Super. 2008) (*en banc*). Probable cause justifying a warrantless arrest for DUI is determined by the "totality of the circumstances." *Commonwealth v. Williams*, 941 A.2d 14, 27 (Pa. Super. 2008) (citations omitted).

■ Trooper Beaver testified that, in initiating the inspection of Maguire's truck, he asked Maguire for his documents. While speaking with Maguire, Trooper Beaver smelled the odor of an alcoholic beverage emanating from his breath. After the inspection of the vehicle, Trooper Beaver asked Maguire to exit the vehicle, asked him if he had been drinking, and advised him that he had detected the odor of alcohol. Maguire responded that he "drank a beer" on his way over to the Landfill. Trooper Beaver observed a cooler on the floor of the truck, in front of the gearshift, and asked Maguire about its contents. Maguire responded that it contained water and beer. The cooler contained three 12–ounce cans of Busch Light beer and a few water bottles. Trooper Beaver then administered three field sobriety tests; Maguire failed two of them.

In light of the undisputed testimony, we conclude that the odor of alcohol on Maguire, coupled with his subsequent admission that he had been drinking beer and Maguire's inability to pass all three sobriety tests, provided Trooper Beaver with

probable cause to believe that Maguire was operating his commercial vehicle under the influence of alcohol.

Order reversed.

Judge Stabile joins the Opinion.

Judge Lazarus files a Dissenting Opinion.

DISSENTING OPINION BY LAZARUS, J.:

I respectfully dissent. I find that the commercial vehicle inspection stop at issue was subject to the *Tarbert/Blouse* [1] guidelines, albeit on different grounds than the suppression court, and the inspection program here was not in substantial compliance with those guidelines. Therefore, the stop of Maguire's vehicle was unlawful, and I would affirm the suppression court's order.[2]

As the majority properly notes, the only evidence the Commonwealth presented at the suppression hearing was Trooper Beaver's uncontradicted testimony. Thus, since no facts are in dispute, the question presented is purely one of law and our standard of review is *de novo*. *Commonwealth v. Beaman*, 583 Pa. 636, 880 A.2d 578, 581 (2005); *see also Commonwealth v. Guzman*, 44 A.3d 688, 691–92 (Pa. Super. 2012).

In his motion to suppress, Maguire claimed the systematic checkpoint did not comply with the guidelines set forth in *Commonwealth v. Tarbert*, 517 Pa. 277, 535 A.2d 1035 (1987) (plurality), and adopted by a majority of the Supreme Court in *Commonwealth v. Blouse*, 531 Pa. 167, 611 A.2d 1177 (1992).

[T]o be constitutionally acceptable, a checkpoint must meet the following five criteria: (1) vehicle stops must be brief and must not entail a physical search; (2) there must be sufficient warning of the existence of the checkpoint; (3) the decision to conduct a checkpoint, as well as the decisions as to time and place for the checkpoint, must be subject to prior administrative approval; (4) the choice of time and place for the checkpoint must be based on local experience as to where and when intoxicated drivers are likely to be traveling; and (5) the decision as to which vehicles to stop at the checkpoint must be established by administratively pre-fixed, objective standards, and must not be left to the unfettered discretion of the officers at the scene.

*Commonwealth v. Worthy*, 598 Pa. 470, 957 A.2d 720, 725 (2008), citing *Blouse*, *supra*, and *Tarbert*, *supra*. "Substantial compliance with the *Tarbert/Blouse* guidelines is all that is necessary to minimize the intrusiveness of a roadblock seizure to a constitutionally acceptable level." *Commonwealth v. Yastrop*, 564 Pa. 338, 768 A.2d 318, 323 (2001). However, where police do not comply with the guidelines in establishing a checkpoint, the trial court should suppress evidence derived from the stop, including the results of field sobriety and blood alcohol testing. *See Commonwealth v. Blee*, 695 A.2d 802, 806 (Pa. Super. 1997).

The suppression court, relying on this Court's en banc decision in *Commonwealth v. Garibay*, 106 A.3d 136 (Pa. Super. 2014), concluded that the *Tarbert/Blouse* guidelines applied to com-

---

1. *Commonwealth v. Tarbert*, 517 Pa. 277, 535 A.2d 1035 (1987) (plurality); *Commonwealth v. Blouse*, 531 Pa. 167, 611 A.2d 1177 (1992).

2. *See Commonwealth v. Williams*, 35 A.3d 44, 47 (Pa. Super. 2011) (this Court can affirm lower court's decision if there is any basis to support it, even if we rely on different grounds).

mercial vehicles when setting up DUI and non-DUI checkpoints. In *Garibay*, the City of Pittsburgh set up a checkpoint as part of the Pennsylvania Department of Transportation's "Click It or Ticket" program, which was designed to ensure compliance with seatbelt requirements. When Garibay's vehicle was stopped at the checkpoint, police suspected he was under the influence of marijuana due to his failure to respond, his trance-like state, and "a particularly pungent odor of marijuana emanating from his person and his vehicle." *Id.* at 137. Garibay was arrested for DUI; a search incident to the arrest yielded a white porcelain pipe in Garibay's front jacket pocket.

Garibay was charged with DUI, possession of drug paraphernalia and two vehicle–related summary offenses. He filed a motion to suppress, alleging police did not comply with the *Tarbert/Blouse* guidelines for checkpoint stops. Following a hearing, the court denied the motion to suppress. On appeal, this Court vacated the judgment of sentence, holding that the existing *Tarbert/Blouse* standards applied to non-DUI checkpoints, and that the Commonwealth failed to present evidence that the checkpoint complied with those standards. *Id.* at 143.

Here, the suppression court found that the inspection checkpoint at issue did not comply with those standards, in particular the fifth criterion that checkpoint stops must be established by administratively pre-fixed, objective standards, and must not be left to the unfettered discretion of the officers at the scene. The suppression court relied on this Court's decision in *Garibay*, stating: "In *Garibay*, the Superior Court made no distinction or exceptions for commercial vehicles." Suppres-

sion Court Opinion, 5/12/16, at 2. However, contrary to the suppression court's interpretation, and Maguire's argument, that issue was not presented in *Garibay*.

*Garibay* involved a Dodge Caravan and a non-DUI/seatbelt safety checkpoint, and we held that the *Tarbert/Blouse* standards applied to non-DUI checkpoints as well as DUI checkpoints. There was no mention of the application of the *Tarbert/Blouse* standards to commercial vehicles. *Garibay, supra*; *see also In re: J.A.K.*, 908 A.2d 322 (Pa. Super. 2006) (non-DUI vehicle checkpoint for seat belt and child seat violations complied with procedural requirements and was not controlled by arbitrary discretion of police officers).

The question, then, is whether there is any reason to find that the *Tarbert/Blouse* guidelines would not apply to a commercial vehicle non-DUI checkpoint. The Commonwealth argues, and the majority finds, that the standards do not apply because commercial vehicle inspections fall within the highly regulated industry exception to the warrant requirement, and, thus, commercial vehicle inspections made pursuant to section 4704 are not governed, or contemplated by, the *Tarbert/Blouse* guidelines.

The United States Supreme Court has recognized an exception to the warrant requirement for administrative inspections in "closely regulated" businesses. *New York v. Burger*, 482 U.S. 691, 693, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). There, the Court defined the characteristics of an administrative search that validly circumvents the warrant requirement. The Commonwealth correctly asserts, and the majority correctly finds, that trucking is a closely regulated industry. *See Commonwealth v. Petroll*, 558 Pa. 565, 738 A.2d 993 (1999).[3] Administrative checkpoint in-

---

**3.** As our Supreme Court noted in *Petroll*, state and federal regulations require drivers

of commercial vehicles to maintain and possess a logbook; the logbook details various

spections, therefore, are not subject to the warrant requirement.[4]

In the context of a pervasively regulated business, a warrantless inspection is reasonable if three criteria are met:

First, there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made[.] Second, the warrantless inspection must be necessary to further [the] regulatory scheme[.] Finally, the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant. In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers.

*Petroll*, 738 A.2d at 1000–1001, quoting *Burger*, 482 U.S. at 702–703, 107 S.Ct. 2636 (citations and quotations omitted) (emphasis added). *See Commonwealth v. Hudak*, 710 A.2d 1213 (Pa. Super. 1998) (discovery of evidence of crimes in course of enforcing otherwise proper administrative inspection does not render search illegal or administrative scheme suspect), citing *Petroll, supra,* and *Burger, supra.*

The Commonwealth argues:

Trooper Beaver was within his duties and requirements as a certified commercial motor vehicle inspector to stop Maguire's commercial vehicle for a safety inspection at the Clinton County Landfill on May 20, 2015. *Because the initial stop of Maguire's commercial vehicle was a lawful administrative search/commercial vehicle inspection not designed to investigate criminal activity, the closely regulated industry exception to the warrant requirement allowed Trooper Beaver to detain Maguire and collect evidence related to a suspected DUI after he had probable cause to believe Maguire was operating his vehicle under the influence of alcohol.* In other words, Trooper Beaver did not stop Maguire's commercial vehicle to investigate whether Maguire had been drinking and driving, but once he detected alcohol on Maguire's breath, the closely regulated industry exception allowed him to detain Maguire and search and seize relevant evidence.

Commonwealth's Brief, at 22–23 (emphasis added).

This argument misses the mark; the Commonwealth's focus on the purpose of the stop is beside the point. During a systematic vehicle inspection, an officer may detain a driver suspected of DUI and search and seize relevant evidence. That presumes, however, that the administrative stop was lawful. Here, the Common-

---

information, including the driver's daily time and mileage of travel for one week. *See* 67 Pa. Code § 229.343; 49 C.F.R. § 395.8. *See also* 75 Pa.C.S.A. § 6103(c) (authorizing PennDOT to adopt federal statutes or regulations relating to vehicles or drivers). The Commonwealth has adopted the federal rule setting a maximum time allowable for commercial driving. *See* 67 Pa. Code § 229.341; *see also* 49 C.F.R. § 395.3 (establishing driving time limits). *Petroll*, 738 A.2d at 1002. *See also Commonwealth v. Pollock*, 414 Pa.Super. 66, 606 A.2d 500, 506 (1992); *Commonwealth v.*

*Berry*, 305 Pa.Super. 8, 451 A.2d 4, 6–7 (1982); 75 Pa.C.S.A. § 4701 *et seq.*

4. Non-commercial vehicles, like commercial vehicles, are also heavily regulated. "Automobiles, unlike homes, are subject to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements." *Tarbert*, 535 A.2d at 1038, quoting *South Dakota v. Opperman*, 428 U.S. 364, 368, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976).

wealth makes that assumption when in fact the question of whether the administrative stop was "lawful" is the precise issue before this Court.

A commercial vehicle safety inspection must comply with section 4704 of the Vehicle Code, which provides the authority for a warrantless inspection. Section 4704 states:

> (a) **Authority to inspect.—**
>
> * * *
>
> (2) Systematic vehicle inspection programs.—Any Pennsylvania State Police officer or qualified Commonwealth employee engaged in a *systematic vehicle inspection* program may inspect any vehicle, driver, documents, equipment and load to determine whether they meet standards established in department regulations.

75 Pa.C.S.A. § 4704(a)(2) (emphasis added). Pursuant to section 4704(a)(2), state officials may execute a systematic vehicle inspection program in order to "remove unsafe vehicles from the roadways before an accident occurs." *Petroll*, 738 A.2d at 1003. This is the same rationale behind section 6308(b) of the Vehicle Code, which provides for systematic inspection of non-commercial vehicles. *See Blouse, supra* (compelling interest of state in protecting its citizens from harm of unsafe vehicles

occupying roadways outweighs privacy interest of individual).

In *Petroll, supra*, the Supreme Court concluded that section 4704 must be read in the context of the rest of the Chapter 47 provisions relating to inspection of vehicles and that it authorizes inspections to discover ongoing violations in order to prevent future harm. The Court specifically noted that the provision does not grant police unlimited discretion to search a driver or vehicle for evidence of a crime. Subsection 4704(a)(2) authorizes police and officials "engaged in a systematic inspection program" to inspect vehicles, drivers, documents, equipment, and load to ascertain compliance with the Pennsylvania Department of Transportation regulations. 75 Pa. C.S.A. § 4704(a)(2). The same rationale applies to section 6308(b) of the Vehicle Code, as amended, 75 Pa.C.S.A. § 6308(b).

Notably, in 1985, while the *Tarbert* case was pending in this Court, the legislature amended the statutes pertaining to both non-commercial and commercial vehicles.[5] *See* 75 Pa.C.S.A. § 6308(b) (as amended 1985, June 19, P.L. 26, No. 20, § 10, effective in 60 days) (authorizing "systematic vehicle inspection programs," and giving authority to police officers who are "engaged in a systematic program of checking vehicles or drivers to stop a vehicle ... for

---

5. This Court's decision in *Commonwealth v. Tarbert*, 348 Pa.Super. 306, 502 A.2d 221 (1985), was filed on December 6, 1985. We held, on independent state constitutional grounds, that, absent probable cause or a reasonable suspicion that a crime has been or is being committed, stopping all vehicles travelling on a public highway, pursuant to a police roadblock, violated an individual's right to be free from unreasonable search and seizure. *Tarbert*, 502 A.2d at 224–25. In the 1985 amendments to the Vehicle Code, the General Assembly added subsection (a)(2), explicitly authorizing a "police officer ... engaged in a systematic program of checking vehicles or drivers" to stop a vehicle upon

request or signal to "secure such other information as the officer may reasonably believe to be necessary to enforce the provisions" of the Motor Vehicle Code. *See* 1985, June 19, P.L. 49, No. 20, § 5, effective 60 days. Prior to 1985, the Vehicle Code did not specifically authorize such systematic roadblocks. The Supreme Court's decision in *Tarbert*, affirming this Court, acknowledged that the roadblock in effect pre–1985 was not statutorily authorized, and thus the roadblock stop as to defendant Tarbert was unlawful. "The illegality arose because the exercise of the police power therein exceeded the statutory parameters then in force." *Tarbert*, 535 A.2d at 1045.

the purpose of checking the vehicle's registration ... or [a] driver's license ..." without the requirement of articulable and reasonable grounds to suspect a violation of the Code); *see also* 75 Pa.C.S.A. 4704(a)(2) (as amended 1985, June 19, P.L. 49, No. 20, § 5, effective in 60 days) (authorizing police and officials "engaged in a systematic inspection program" to inspect vehicles, drivers, documents, equipment, and load to ascertain compliance with Pennsylvania Department of Transportation regulations). These statutory amendments provided the authority for warrantless systematic inspections or checkpoints, of both commercial and non-commercial vehicles, and our Supreme Court's subsequent 1987 decision in *Tarbert*, and its 1992 decision in *Blouse*, set forth guidelines to assure that the inspection programs provide a constitutionally adequate substitute for a warrant. *See Burger, supra.*

In my opinion, the statutory language, the interests promoted, and the evils to be addressed by section 4704(2) and section 6308(a)(2) are identical. Both commercial and non-commercial vehicles are heavily regulated, and thus both fall within an exception to the warrant requirement. I would find, then, that the Commonwealth's argument is unpersuasive; the fact that commercial vehicles fall within the heavily regulated industry exception to the warrant requirement does not necessarily preclude a finding that the *Tarbert/Blouse* guidelines apply, and I see no reason to exempt systematic commercial vehicle inspections from those standards. Administrative searches without a warrant are permitted when there is substantial government interest, the search is necessary to further the regulatory scheme, and the inspection program provides a constitutionally adequate substitute for a warrant. *Tarbert, supra; Blouse, supra.* It is significant to note that the underlying principles of the *Tarbert/Blouse* guidelines, and the *Burger* requirements for administrative warrantless searches in a closely regulated industry, are compatible; most critically, both mandate *limits on the discretion of inspecting officers, the key factor missing here.*

In my view, the *Tarbert/Blouse* guidelines provide a practical framework for ensuring that the inspection program provides a constitutionally adequate substitute for a warrant. And, as our Supreme Court has stated in *Tarbert* and in *Blouse*, "[s]ubstantial compliance with the guidelines is all that is required to reduce the intrusiveness of the search to a constitutionally acceptable level." *Tarbert*, 535 A.2d at 1043; *Blouse*, 611 A.2d at 1180. *See also Commonwealth v. Worthy*, 598 Pa. 470, 957 A.2d 720 (2008); *Commonwealth v. Yastrop*, 564 Pa. 338, 768 A.2d 318 (2001); *Garibay, supra.*

I also find unconvincing the Commonwealth's argument that because the *Tarbert/Blouse* guidelines preclude a physical search of the vehicle or its occupants and reference intoxicated drivers that they, therefore, do not apply to commercial vehicle inspections. The guidelines are easily adapted to non-DUI checkpoints, as illustrated in *Garibay*, and to commercial vehicles, as here. The critical concern is that the inspection be systematic, non-arbitrary, and not left to the discretion of the inspecting officers. As our Supreme Court stated in *Tarbert*, "[s]ubstantial compliance with the guidelines is all that is required to reduce the intrusiveness of the search to a constitutionally acceptable level." *Tarbert*, 535 A.2d at 1043.

For these reasons, I would find the *Tarbert/Blouse* standards applicable to systematic inspections for commercial vehicles. Here, the systematic vehicle inspection program was required to comply with

the provisions of the Vehicle Code, which authorized the inspection for compliance with its mandates. A lawful administrative search, conducted in accordance with section 4704 and the *Tarbert/Blouse* guidelines, would not offend Article I, Section 8 of the Pennsylvania Constitution, and the fruits of the search would be admissible.

I would also find that the record supports the suppression court's finding that the inspection program did not comply with *Tarbert/Blouse*. Here, the court examined each of the *Tarbert/Blouse* factors, and it made specific findings that the Commonwealth offered no evidence or testimony with respect to three of the five standards. In particular, the court found the Commonwealth did not establish sufficient warning of the existence of the checkpoint. Additionally, the choice of time and place for the checkpoint must be based on local experience as to the particular reason for the checkpoint. *See Worthy, supra*. Finally, and of particular concern, Trooper Beaver's testimony as to how officers determined which vehicles to stop at the checkpoint did not support a finding that the procedure followed objective standards. Instead, the procedure he described allowed for officer discretion. The procedure permitted each of the officers to perform inspections and, when available, the officer could inspect the next truck that entered the landfill. In other words, if all of the officers on the team were occupied with inspections, one truck, or many, could enter the landfill without inspection. Absent an objective standard by which the officers stopped the trucks, stops could feasibly be left to an officer's "unfettered discretion." *Worthy*, 957 A.2d at 725 (discussing *Tarbert, supra*, and *Blouse, supra* ). I find this is a clear violation of the *Tarbert/Blouse* requirements.

In conclusion, I would find the *Tarbert/Blouse* standards apply to commercial vehicle checkpoints, and the record supports the suppression court's finding that the inspection here was not in substantial compliance with those standards. *Guzman, supra*. Thus, the stop of Maguire's vehicle was unlawful. I would affirm the suppression court's order.